Sigmund Cohn v. Commissioner.
Cohn v. Commissioner
Docket No. 9659.
United States Tax Court
1947 Tax Ct. Memo LEXIS 137; 6 T.C.M. (CCH) 865; T.C.M. (RIA) 47209; July 18, 1947
*137 After World War I, taxpayer formed a business with his son and nephew. An enforcible partnership agreement was not made because taxpayer feared possible complications, but instead they were promised a specific salary plus a share of the profits to be fixed at the end of each year. This arrangement continued for more than twenty years and the success of the business was largely due to the special skills and hard work of the son and nephew. In 1942, however, a full-fledged partnership was formed with the son and nephew each getting one-fourth interest. For gift tax purposes taxpayer reported that he was making a gift of one-fourth the capital account to each of them. The Commissioner determined a higher valuation on the basis of other items on the books and a capitalization of the interests on the basis of earnings. Held, that the value of the gifts was as reported by taxpayer. The donees actually acquired little through the gift that they had not had before, and were now required to share liability for debts of the partnership. James O. Wynn, Esq., and George G. Blattmachr, Esq., for the petitioner. Conway Kitchen, Esq., for the respondent. HARLAN Memorandum *138 Findings of Fact and Opinion HARLAN, Judge: The Commissioner determined a deficiency in Federal gift tax against the petitioner for the calendar year 1942 in the amount of $31,852.88. The question for consideration is: What was the fair market value of each one-fourth interest in the partnership of Sigmund Cohn & Co., which the petitioner transferred as a gift to Adolph and Sidney Cohn, his son and nephew, respectively. Findings of Fact The petitioner is an individual with principal place of business at 44 Gold Street, New York City, who filed his gift tax return in the second district of New York. In 1901, petitioner, who in 1942 was 72 years of age, formed a partnership with one Belais to sell precious metals and their alloys to manufacturing jewelers. Prior thereto he had had a grade school education and had taken a course in inorganic chemistry at Cooper Union. In 1913 Sidney Cohn, petitioner's nephew, became an employee of Belais & Cohn. At that time Sidney had attended the College of the City of New York for two years and he continued his studies at this college in chemistry, metallurgy, and civil engineering. In 1916 Adolph Cohn, petitioner's son, who was also attending *139 the same college studying similar [subjects], was also employed by Belais & Cohn. In 1917 Sigmund, Adolph and Sidney all entered the United States military service and Belais & Cohn was dissolved. At the end of the war they made an oral agreement wherein Sigmund informed Adolph and Sidney that he considered them his partners but did not desire to make an enforcible partnership agreement because he feared family complications in the event of the death of one of them. By this agreement the two boys were to receive as salary $4,250 each and a share of the profits to be fixed at the end of each year. Its amount was to be determined by Sigmund, who, in so doing, would take into consideration the conditions then existing in the business and the profits and loss made in other years. Sigmund's ultimate aim in adjusting these bonus payments was to give Adolph and Sidney a share of 25 per cent of the profits. The distribution of salaries and bonuses under this agreement from 1930 to 1941, inclusive, is as follows: Net Profit Be-
Net Loss Before
fore Deduction
Deduction of In-
Basic
of Income Tax
come Tax and
com-
and Payments
Payments to
pensation
Additional com-
to Adolph and
Adolph and
paid to
pensation paid
Total compen-
Sidney Cohn
Sidney Cohn
each of
to each of
sation paid to
but After De-
but after De-
Adolph
Adolph Cohn
each of Adolph
duction of all
duction of all
and Sidney
and Sidney
and Sidney
Year
Other Expenses
Other Expenses
Cohn
Cohn
Cohn
1930
$ 53,282.23
$4,250.00
$ 4,250.00
1931
38,865.58
4,250.00
4,250.00
1932
54,756.44
4,250.00
4,250.00
1933
$ 17,594.55
4,250.00
$ 4,000.00
8,250.00
1934
37,002.64
4,250.00
5,000.00
9,250.00
1935
68,126.99
4,250.00
10,000.00
14,250.00
1936
153,756.58
4,250.00
20,000.00
24,250.00
1937
52,864.96
4,250.00
10,000.00
14,250.00
1938
27,840.46
4,250.00
5,000.00
9,250.00
1939
65,382.43
4,250.00
9,000.00
13,250.00
1940
52,403.22
4,250.00
7,000.00
11,250.00
1941
124,137.51
4,250.00
25,000.00
29,250.00
Total
$599,109.34
$146,904.25
$146,000.00
146,904.25
$452,205.09
Period 1/1/42
Through 8/31/42
$253,516.54
$2,860.55
$25,000.00
$ 27,960.55
*140 During their employment Adolph and Sidney made withdrawals from their accounts as needed and on June 1, 1937, Adolph's credit balance was $50,000 and Sidney's balance was $10,000. These balances remained fixed until the formation of the partnership in August 1942. Sigmund treated the credit balances of Adolph and Sidney as loans to him and paid interest thereon as follows: Year
Sidney
Adolph
1930
$ 881,82
$ 3,497.37
1931
934.72
3,656.82
1932
778.90
3,047.25
1933
778.90
3,047.20
1934
492.70
2,444.09
1935
2,250.00
1936
2,250.00
1937
500.00
2,500.00
1938
500.00
2,500.00
1939
500.00
2,500.00
1940
500.00
2,500.00
1941
500.00
2,500.00
1942 to August 31st
333.33
1,666.67
Total
$6,700.37
$34,359.40
On June 6, 1929, Sigmund made two identical written agreements with Adolph and Sidney, the essential parts of which are: "WHEREAS, the party of the first part is entitled to a certain credit from the party of the second part which said credit more particularly appears upon the books of the said party of the second part * * * * * *
"NOW, THEREFORE, * * * the party of the first part agrees as follows: "FIRST: He will not *141 withdraw the said credit as the same now exists or as the same may hereinafter be added to, except that in any one year he may withdraw against the said credit a total not exceeding TWENTY THOUSAND DOLLARS ($20,000.). "SECOND: In case, at any time hereafter, the capital of the said party of the second part as such capital existed on the 31st day of December 1927 shall become impaired through the operation of the business in which the said party of the first part is employed by the said party of the second part, the said present as well as any future credit shall be applied to make good such impairment to the full extent of such present or future credit. * * *
"FOURTH: Upon the termination of this agreement * * * if then it shall appear that the said capital of the said party of the second part as the same existed on the 31st day of December 1927 has been impaired, the credit of the party of the first part, as the same existed at the termination of this agreement shall be applied to make good such impairment and the balance only of such credit remaining after such application shall be paid to the party of the first part; * * * "FIFTH: Either party to this agreement may terminate *142 the same by giving to the other notice of his election to terminate the same; * * *" Beginning in 1920, due to the activities of Adolph and Sidney, the firm added an industrial line to its former sales business. This was the manufacture of very fine wire and metallic ribbons according to customers' specifications on each order. Sigmund lacked the technical knowledge for this work and confined his efforts to buying and selling rare metals to jewelry manufacturers. This business was highly competitive and sales were made solely on a price basis. There was no advertising for or trade with retail customers. Sigmund would not have entered the industrial field without Adolph and Sidney. The latter two made all contacts for industrial business, handled all correspondence, estimated prices, passed on credits, negotiated labor contracts and arranged for bank loans when necessary. With the World War II restrictions on jewelry and its increased demand for wire for gold braid on uniforms and also for newly developed electrical wire equipment, there was a large increase in the industrial part of the work. In 1942 the internal revenue agent examining petitioner's 1941 return disapproved the *143 deduction of a large portion of the petitioner's salary and bonus payments to Adolph and Sidney. To lighten the increased tax burdens which this ruling imposed, Sigmund initiated steps to form a full-fledged partnership. On August 31, 1942, he made a gift of a one-fourth share of his business assets to Adolph and a similar share to Sidney. On October 28, 1942, Sigmund, as first party, Adolph as second party, and Sidney as third party, entered into a written partnership agreement, the material and relevant parts of which are: "FIFTH: (A) That the capital of the partnership shall consist of - "(1) the business assets of the First Party as of the close of business on August 31, 1942, less all business liabilities outstanding on that date * * * "(2) fifty thousand ($50,000.) dollars, owed by the First Party to the Second Party, and now employed in the aforesaid business; and "(3) ten thousand ($10,000.) dollars, owed by the First Party to the Third Party, and now employed in the aforesaid business. "(B) That the respective interests of each in the aforesaid capital of the business are as follows: "First Party
fifty-four thousand one
hundred sixty-six and
25/100 ($54,166.25) Dol-
lars
"Second Party
seventy-seven thousand
eighty-three and 12/100
($77,083.12) Dollars
"Third Party
thirty-seven thousand
eighty-three and 12/100
($37,083.12) Dollars.
*144 * * *
"SEVENTH: (A) That none of the parties shall without the written consent of the others, advance any moneys to the partnership by way of additional capital or otherwise; but should any such advances be made by any party with the written consent of the others, same shall bear interest at the rate of five (5%) per cent per annum until repaid. "(B) That none of the parties shall, without the written consent of the others, become indebted to the partnership; but should an advance be made to any party with the written consent of the others, the resultant indebtedness to the partnership shall bear interest at the rate of five (5%) per cent per annum. * * *
"TENTH: (A) That the net profits of the partnership shall be divided among the parties as follows: "First Party
fifty (50%) per cent
"Second Party
twenty-five (25%) per
cent
"Third Party
twenty-five (25%) per
cent
* * *
"ELEVENTH: (A) That if any party shall elect to retire from the partnership before the end of the term fixed for its duration, then and in such event such party shall give to the other parties notice in writing of his election to retire * * *." On August 31, 1942, Sigmund *145 Cohn's assets were as follows: Total current assets
$649,204.44
Total fixed assets
25,504.68
Total assets
$674,709.12
Total liabilities
566,376.63
Capital
$108,332.49
In addition to the above assets there was listed on Sigmund Cohn's balance sheet: Special Savings Account of
Rose and Adolph Cohn
$ 9,984.70
First Mortgage receivable from
Adolph Cohn
14,000.00
Total
$ 23,984.70
The net sales and profits of the partnership (before income taxes of Sigmund Cohn & Co.) for the fiscal years ended August 31, 1943, 1944, 1945 and 1946 are as follows: Fiscal Year Ended
Fiscal Year Ended
Fiscal Year Ended
Fiscal Year Ended
Aug. 31, 1943
Aug. 31, 1944
Aug. 31, 1945
Aug. 31, 1946
Net Sales
$2,017,199.14
$1,853,886.14
$1,980,691.75
$1,893,834.56
Net Profits
483,931.22
255,251.28
260,777.01
155,664.78
In his gift tax return for the calendar year 1942 the petitioner included as a gift made to his son, Adolph Cohn, in that year the sum of $27,083.12 and as a gift made to his nephew, Sidney Cohn, in that year the sum of $27,083.12. The said sums of $27,083.12 each were computed at 25 per cent of the amount *146 of petitioner's capital account as shown on the balance sheet as of August 31, 1932. In the notice of deficiency herein the respondent determined that value of each of the above gifts made by the taxpayer was $100,000 and the deficiency is represented by the tax on the difference in valuation between that declared by the taxpayer and the one determined by the Commissioner. The gifts made by the petitioner to his son, Adolph Cohn, and his nephew, Sidney Cohn, did not exceed in value $27,083.12 each. Opinion Respondent, in his notice of deficiency, refused to approve the taxpayer's valuation of $27,083.12 upon each of his gifts to Adolph and Sidney and determined a deficiency based upon a valuation of $100,000 for each gift. In his brief respondent contends that the value of Sigmund's capital should be increased by the addition of Adolph's savings account and the mortgage in the approximate amount of $24,000, which items were included in Sigmund's balance sheet. This addition would increase the value of the tangible gifts to Adolph and Sidney to $32,362. Respondent also contends that the "demonstrated earning capacity" of the newly formed partnership as demonstrated by its gross *147 sales and profits following its formation justifies a capitalized valuation of $74,173.29, on a one-fourth interest in said partnership in addition to the value of the tangible assets. This would make the total valuation of the one-fourth interest in the partnership $106,805.29. We cannot accept either of respondent's contentions. Adolph and Sidney handled the bank loans of Sigmund. The banks relied on the two young men for repayment. It would not, therefore, be surprising if Adolph were to add some of his personal assets to Sigmund's balance sheet in the event the banks demanded greater security. However, there is nothing in the record to indicate that Adolph ever made a gift of his property to Sigmund or that Sigmund ever considered this savings account and mortgage of Adolph as his personal property. The balance sheet designated it as belonging to Adolph and in the analysis of the capital of the partnership Adolph's private property was not included. Furthermore, it was not included in Sigmund's balance sheet attached to the partnership agreement. It is our conclusion, therefore, that these items could not be considered a part of Sigmund's gift. In considering respondent's *148 second contention that there was a value to Sigmund's gift in addition to the tangible worth thereof consisting of "demonstrated earning capacity," we will consider the gift and the formation of the partnership as one transaction since this is the premise of respondent's reasoning. We will, therefore, compare the possessions, rights and obligations of Sidney and Adolph before and after the formation of the partnership in 1942. The nature of their work in the business was the same before as after the partnership, except that as the business increased, their duties, as well as those of Sigmund, became more exacting. Before the partnership they had each received as income for the years 1930 to 1941, inclusive, $146,000. During that same period Sigmund had made $599,109 profit and had suffered a loss of $146,904, leaving his net profit $452,205. They therefore received 32 per cent of Sigmund's profits. If we compute only the years 1933 to 1941, inclusive, they received during those years in excess of 22 per cent of the profit. In fairness to Sigmund his distribution of profits during the eight months of 1942 ought not to be considered because at that time he had been informed that he *149 must pay the tax himself on a large portion of the distribution to Adolph and Sidney and quite naturally he reduced their distributive shares. However, if the first eight months of 1942 is added, Sigmund had a net profit of $705,721 and had paid to Adolph and Sidney $173,960 or 24 per cent of his net profit. After the partnership Adolph and Sidney each received a flat 25 per cent. Before the partnership Sidney and Adolph received their regular salaries for three years when Sigmund was operating his business at a very substantial loss. After the partnership, of course, they would receive nothing in years of loss. Before the partnership Sidney received $6,700 as interest and Adolph $34,359. Under the partnership agreement they were not entitled to receive any interest on their initial capital investment which was the credit balance on which they had been receiving interest prior thereto. Before the partnership the liability of Adolph and Sidney for Sigmund's debts was limited to their respective credit balances with him. Thereafter their entire assets were liable to the partnership debts. Before the partnership, the profits of Sigmund Cohn were much less than were those of Sigmund Cohn *150 & Co. Thus it is evident that the two junior partners lost many substantial rights and privileges by entering into the partnership and at the same time they undertook liabilities to which they were not previously obligated. The only advantage offered them by the partnership arrangement was that their share of the profits became fixed as a contractual obligation, whereas prior thereto it had been subject to the determination of Sigmund alone. However, this advantage sinks into insignificance when we consider the situation of the parties. Adolph and Sidney with their educational background, technical experience, business contacts and joint capital of at least $60,000, not including Adolph's known additional private assets of $24,000, were in a perfect position to leave Sigmund at any time they became dissatisfied with their share of the profits or whenever Sigmund failed to carry out a fair division. The testimony in this case shows that Adolph and Sidney, among their technical achievements, had produced and sold a platinum wire of such microscopic cross section that it would take 25,000 such wires to equal a cross section of an average human hair. A cubic foot of platinum drawn *151 into wire of this diameter would be capable of encircling the globe 8,000 times at the equator. Men with such technical skills are not called upon to rely upon the whim of an employer who does not comply with his oral promises. The increased sales and profits after the partnership resulted solely from the increased labor and responsibility of the partners. They could have, and no doubt would have, worked with the same earnestness and with the same results to profits even though no gift had been made and no partnership had ever been formed. Therefore, if we balance the improvements in position, if any, of Adolph and Sidney before the partnership against their definite losses upon entering into the partnership and their increased personal liability for the partnership, it is difficult to see that the two junior members of the partnership did anything but lose by the transaction. If, however, it might be contended that an improvement did result, certainly that improvement would be no more than these two men had earned by over twenty years of faithful service and hard work. As a result of that service and work they acquired experience, knowledge and business contacts that were in addition *152 to their financial returns from their employment by Sigmund Cohn. When, at the time of the partnership they threw these additional assets into the partnership business they certainly more than paid for any imaginary advantage which the partnership brought to them. In resolving against the respondent his contentions that the so-called "demonstrated earning capacity" of the partnership had a value in excess of the value of the tangible assets, we adopt the reasoning in W. J. Rothrock, 7 T.C. 848, wherein it is said: "Our interpretation of the evidentiary facts leads us to the ultimate finding that petitioners have borne their burden of showing that the business by itself possessed no substantial element of future earning power or good will, but that, on the contrary, its income was derived primarily from personal services, so that different participants with similar abilities, experience, and contacts could have organized a comparable venture and enjoyed a parallel success from their contribution of time, skills, and services. See, e.g., Amalgamated Products Co., 12 B.T.A. 659. This factor, coupled with the proven capacity of the respective sons and the *153 value to the business of their contributions, results in our inability to discover any gift of interests, tangible or intangible, direct or indirect, to which the tax could attach." The taxpayer in 1942 reported a valuation of $27,083.12 on two gifts. The Commissioner has represented to this Court that the value of these gifts should be increased because of certain property listed on Sigmund Cohn's balance sheet which was therein declared to be the property of Adolph Cohn and also because of an alleged demonstrated earning capacity which Sigmund Cohn transferred to the partnership when it was formed. As stated above, we have found against the contentions of the respondent on both of these issues, and we further find that the value of Sigmund Cohn's gifts to Sidney Cohn and Adolph Cohn in 1942 was $27,083.12 each as returned by the taxpayer. Decision will be entered for the petitioner.